UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
PAUL NAVARRO, as Guardian for
PAUL NAVARRO, JR.

Plaintiff,

Civil Action No.:
2:18-cv-05829-DRH-SIL

-against-

INDEPENDENCE BLUE CROSS and
MSC INDUSTRIAL DIRECT CO., INC., &
AFFILIATES ASSOCIATE MEDICAL PLAN,

Defendants.
---------------------------------------------------------------X

**SECOND AMENDED COMPLAINT**

By way of this Complaint, and to the best of its knowledge, information and belief, formed upon a reasonable inquiry under the circumstances, Plaintiff, Paul Navarro, as Guardian for Paul Navarro, Jr. ("Plaintiff"), brings this action against Defendants, Independence Blue Cross ("IBC"), and MSC Industrial Direct Co., Inc. & Affiliates Associate Medical Plan ("MSC") (collectively, "Defendants").[1] MSC is the Plan Administrator and Plan Sponsor for the Group Benefits Plan under which Paul Navarro, Jr., IBC ID Number MGG05181891, a patient of Long Island Neurosurgical Associates, P.C. ("LINA"), received health care coverage. IBC, through its subsidiary QCC d/b/a Independence Administrators is the claims administrator of this self-funded Plan.

1. This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning IBC's under-reimbursement to Plaintiff for surgical services for Paul Navarro, Jr., a minor, who suffers from Spina Bifida, Hydrocephalus, Chiari type II malformation (a life threatening condition where the cerebellum and

---

[1] Plaintiff signed a HIPAA release giving permission to reproduce otherwise protected healthcare information in this Second Amended Complaint.

brain stem extend past the base of the skull), Tethered Cord and Neurogenic bladder and has a history of multiple ventriculoperitoneal shunt revisions. He was admitted to Steven and Alexandra Cohen Children's Medical Center in New Hyde Park, New York (the "Hospital") on January 20, 2015 for surgery.

2. The Patient was born on August 19, 2003 with myelomeningocele (a form of spina bifida that occurs when the spinal canal and backbone do not close before birth). Mark A. Mittler, M.D. ("Dr. Mittler"), a surgeon affiliated with LINA, a New York professional corporation and an out-of-network neurosurgical practice group, operated on the Patient's nervous system shortly after he was born due to fluid on his brain resulting in hydrocephalus as well as Chiari type II malformation requiring multiple surgeries thereafter, including placement of a brain shunt. The January 20, 2015 surgery was for a life-threatening obstruction of his shunt.

3. On behalf of Plaintiff, LINA submitted an invoice to IBC for the January 20, 2015 date of service for $69,162.00 and was paid $3,459.49.

4. On its initial under-reimbursement and in each response to LINA's appeals, IBC simply stated that its reimbursement amount was the maximum amount possible, without further explanation, and without including the basis for its determination or any documents or data it may have used to make its decision.

5. Dr. Mittler was one of the only pediatric neurosurgeons with privileges at the Hospital who could perform these complex pediatric neurosurgical procedures. The only other pediatric neurosurgeons with privileges at the Hospital who could perform this surgery were also affiliated with LINA.

6. Dr. Mittler is an officer and director of LINA and is a pediatric neurosurgeon with extensive specialty training and experience in the field of pediatric neurosurgery.

7. Dr. Mittler obtained his Bachelor's Degree in Neuroscience in 1987 and his M.D. in 1991 from the University of Rochester. He completed his neurosurgical residency at Brown University in 1998, where he helped transition pediatric neurosurgical care to the newly created Hasbro Children's Hospital. He completed his fellowship in pediatric neurosurgery at Children's Hospital Los Angeles. In 1999 Dr. Mittler returned to Long Island to further develop pediatric neurosurgery in the region.

8. Dr. Mittler is a member of the American Association of Neurological Surgeons, the Congress of Neurological Surgeons, the Joint Section of Pediatric Neurosurgery, and the American Society of Pediatric Neurosurgeons. He is board certified by the American Board of Neurological Surgery and the American Board of Pediatric Neurological Surgery. He is a Clinical Associate Professor of Neurosurgery and Pediatrics at the Hofstra/Northwell LIJ School of Medicine where he also serves as a member of the Core Admission Committee for Medical Education. Dr. Mittler is the Director of Quality Assurance for the Department of Neurosurgery in the Northwell Health and is Co-Chief of the Division of Pediatric Neurosurgery at Northwell Health and at the Hospital.

9. Dr. Mittler's clinical expertise includes the management of pediatric brain and spinal cord tumors, vascular malformations, craniosynostosis, hydrocephalus, spinal dysraphism, arachnoid cysts, and traumatic brain injury.

## **JURISDICTION**

10. The Court has subject matter jurisdiction over Plaintiff's ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction).

11. The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and each Defendant, IBC and MSC, systematically and continuously conducts business in the State of New York, and otherwise has minimum contacts with the State of New York sufficient to establish personal jurisdiction over each of them.

12. Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) IBC resides, is found, has an agent, and transacts business in the Eastern District, (b) IBC conducts a substantial amount of business in the Eastern District, including marketing, advertising and selling insurance products, and insures and administers group healthcare insurance plans both inside and outside the Eastern District, including from offices located in the Eastern District, and (c) MSC is found in the Eastern District.

**PARTIES**

13. Plaintiff, Paul Navarro, as guardian for Paul Navarro, Jr. was a plan participant of MSC Industrial Direct Co., Inc. & Affiliates Associate Medical Plan. His son, Paul Navarro, Jr. is a beneficiary of the Plan.

14. Defendant, IBC, is a health care insurance company with headquarters located in Philadelphia, PA and offers claims processing for self-funded plans in the State of New York through its QCC subsidiary. It is the claims administrator for the MSC Industrial Direct Co., Inc. & Affiliates Associate Medical Plan.

15. Defendant, MSC Industrial Direct Co., Inc. & Affiliates Associate Medical Plan, is a self-funded Plan for employees of MSC Industrial Direct Co., Inc. & Affiliates, a corporation with offices at 75 Maxess Road, Melville, New York 11747. MSC Industrial Direct Co., Inc. & Affiliates is the Plan Administrator and Plan Sponsor of the Plan.

16. The Summary Plan Document ("SPD") states that the "people who are responsible for the operation of the Associate benefit plan" (the Plan Administrator), who are fiduciaries under the Plan, have a duty to operate the Plan prudently and in the interests of plan participants and beneficiaries.

## FACTUAL ALLEGATIONS

17. On January 20, 2015, Paul Nararo, Jr., a patient of Dr. Mittler and a beneficiary of the Plan, was admitted to the Hospital for surgery.

18. Dr. Mittler performed, among other things, an L5 laminectomy, microscopic release of a tethered spinal cord, mysfascial flat closure and creation of thecal sac.

19. Dr. Mittler and the other physicians affiliated with LINA were the only pediatric neurosurgeons with surgical privileges in the Hospital. There was no other pediatric neurosurgical medical practice in Paul Navarro's network in the geographic area. He had no other option than to have Dr. Mittler or another physician affiliated with LINA render the necessary medical services.

20. Dr. Mittler was not in-network, but he obtained prior authorization from IBC under authorization no. 1501400061 to perform this surgery on behalf of the patient.

21. After the surgery, Dr. Mittler, through LINA's billing company, Business Dynamics ("BD"), submitted an invoice (a CMS-1500 form, as required) to IBC for $69,162.00 representing CPT codes (i) 15734 for $30,000.00 for which only $1,555.33 was paid, (ii) 63200 in the amount of $34,162.00 for which only $2,041.94 was paid, (iii) 69990 in the amount of $5,000.00 for which $287.42 was paid for the medical services rendered on January 20, 2015 on behalf of Paul Navarro, Jr.

22. The total amount billed was $69,162.00, and the total amount paid was $3,884.69, which was purportedly based upon 150% of Medicare.

23. BD, on behalf of LINA and on behalf of Navarro, filed appeals to IBC. IBC denied these appeals on the basis that its payments were the maximum amounts possible. However, in Answers to Plaintiff's Omnibus Demands served in the State Court action prior to its being removed, IBC stated that as an out-of-network provider no appeals were permitted to LINA.

24. Plaintiff, through LINA and BD, demanded a copy of the Plan terms pursuant to which IBC and MSC had made their reimbursement determinations. This information, which must be provided upon request under ERISA, was never provided.

25. IBC violated ERISA when it provided incorrect, unreasonable and invalid purported reasons for its under-reimbursements in its Explanation of Benefits ("EOB") and failed to provide any reason for its determination in its appeal response. MSC, as Plan Administrator is responsible, as fiduciary, for the claim administrator's actions.

29 C.F.R. § 2560.503-1(g) provides as follows:

**Manner and content of notification of benefit determination.**

(1) The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant -

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan -

(A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

26. IBC provided none of the information required by 29 C.F.R. § 2560.503-1(g), in violation of ERISA and the rules promulgated thereunder.

27. These requirements are also set out in the SPD. Under ERISA, when an insurer fails to follow the procedures set out in the SPD, the claimant is deemed to have exhausted his administrative remedies.

28. Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

> [I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29. IBC's EOB dated February 23, 2015 stated that "[t]he amount shown exceeds the maximum amount of benefits allowed by the subscriber's agreement for this service." There was no further explanation, neither a description of what the maximum benefit amount was, nor an identification of the agreement, and no indication of what the agreement said.

**THERE WERE NO OTHER OPTIONS AVAILABLE TO PATIENT--**
**THERE WAS NO IN-NETWORK PROVIDER FOR EITHER DATES OF SERVICE**

30. Because Dr. Mittler was the only pediatric neurosurgeon with privileges at the Hospital who could perform the complex surgery that Paul Navarro, Jr. required (other than two other surgeons affiliated with LINA), IBC should have defined Dr. Mittler as an in-network provider and paid him at an in-network rate, if such a rate could be determined, or at full billed charges where, as here, it could not legitimately determine an in-network rate.

31. On information and belief IBC does not have any pediatric neurosurgeons in its network not only with Dr. Mittler's expertise to perform this surgery and privileges at the Hospital, but anywhere in Nassau County at all. Paul Navarro, Jr. could not have had this surgery performed by an IBC in-network pediatric neurosurgeon because there were none in IBC's network in the

entire County. Because IBC is part of the Blue Cross Blue Shield system, IBC's network includes the BlueCard System which, in Nassau County, would be administered by Empire BCBS. This allegation includes the entire BCBS network in Nassau County available to IBC that it could in turn make available to MSC.

32. This is not surprising. There are only three pediatric neurosurgeons in Nassau County who can perform this complex pediatric neurosurgery, and all are associated with LINA.

33. Based on the above, and consistent with the terms of the SPD, Plaintiff should have been paid the in-network rate or, alternatively, the billed amount.

34. This is consistent with NY Ins. Law § 4804(a), which states:

> **Access to Specialty Care**
>
> If an insurer offering a managed care product determines that it does not have a health care provider in the in-network benefits portion of its network with appropriate training and experience to meet the particular health care needs of an insured, the insurer shall make a referral to an appropriate provider, pursuant to a treatment plan approved by the insurer in consultation with the primary care provider, the non-participating provider and the insured or the insured's designee, at no additional cost to the insured beyond what the insured would otherwise pay for services received within the network.

35. IBC should have determined that it did not have an appropriate provider in its network and made a referral to the only appropriate provider, Dr. Mittler. It should have paid LINA the in-network rate for these procedures, which would have resulted in Paul Navarro (the plan participant) incurring no additional costs other than the co-pay and deductible an insured would be liable to pay for in-network services.

36. NY Ins. Law § 4804(a) is consistent with the terms of the Certificate of Insurance and does not impose additional or inconsistent terms. Accordingly, it is not preempted by ERISA.

37. Instead, IBC simply treated Dr. Mittler as an ordinary out-of-network provider and paid him based on a purported out-of-network Medicare rate.

38. In the alternative, IBC should have offered Dr. Mittler and LINA a Single Case Agreement. Such an agreement is common among insurers and out-of-network providers where the insurer does not have a provider in its network which can provide the required procedures or services for its member. It is a one-time agreement negotiated with the provider and does not encompass services beyond that provided to the single member. As such, it is a negotiated exception to the rates set out in the SPD governing out-of-network reimbursement or a reimbursement for emergent medical care. By under-reimbursing LINA, Defendants left Plaintiff exposed to LINA for the unreimbursed medical expenses rendered to his son.

**COUNT I**

**CLAIM AGAINST IBC FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA**

39. As the claims administrator for the Plan, IBC is obligated to pay benefits to Plan participants and beneficiaries in accordance to the terms of the Plan, and in accordance with ERISA.

40. IBC violated its legal obligations under this ERISA-governed plan when it under-reimbursed Plaintiff for pediatric neurosurgical services provided to the Patient, a Plan beneficiary, in violation of the terms of the SPD and therefore in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B), and for failing to provide the SPD to Plaintiff.

41. Plaintiff seeks unpaid benefit, and statutory interest back to the date Plaintiff's claim was originally submitted to IBC. It also seeks attorneys' fees, costs, prejudgment interest and other appropriate relief against IBC.

## COUNT II

## CLAIM AGAINST MSC INDUSTRIAL DIRECT CO., INC. & AFFILIATES ASSOCIATE MEDICAL PLAN FOR VIOLATION OF ERISA 404 § (A)(1)(B)

42. As the Plan Administrator and Plan Sponsor for the Plan, the Plan is a fiduciary, and under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104 (a)(1)(B), it must discharge its duties solely in the interests of Plan participants and beneficiaries.

43. The Plan must act prudently with the care, skill, prudence and diligence that a prudent fiduciary would use, and must ensure that it is acting in accordance with Plan documents, such as its SPD.

44. An ERISA fiduciary cannot fully delegate its fiduciary responsibilities to another entity. For example, the Plan cannot fully delegate its fiduciary responsibilities to its claims administrator, IBC, and be free of its fiduciary responsibilities under ERISA.

45. As a fiduciary, the Plan owed Plaintiff a duty of loyalty and the avoidance of self-dealing. It cannot permit its claims administrator to make claims determinations that would save the Plan money at the expense of its participants that violate the terms of the SPD.

46. The Plan breached its duty of loyalty and violated its fiduciary responsibilities to Plaintiff by failing to ensure that its claims administrator was reimbursing Plaintiff according to the Plan's SPD. Instead, IBC under-reimbursed Plaintiff for a surgical procedure, and the Plan failed to monitor and correct IBC's misconduct, despite the Plan's continuing duty to do so.

47. Plaintiff seeks relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which includes declaratory relief, surcharge, profits, and removal of a fiduciary that breached its duties.

**WHEREFORE**, Plaintiff demands judgment in its favor against IBC and the Plan as follows:

(a) Ordering IBC and the Plan to recalculate and issue unpaid benefits to LINA on behalf of the Plaintiff;

(b) Ordering declaratory relief;

(c) Ordering the remedies of surcharge, profits, and the removal of a disloyal Plan fiduciary;

(d) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and costs and expenses in amounts to be determined by the Court;

(e) Awarding prejudgment interest; and

(f) Granting such other and further relief as is just and proper.

Dated: November 28, 2018

/s/ Nan Geist Faber
NAN GEIST FABER, P.C.
996 Dartmouth Lane
Woodmere, NY 11598
(516) 526-2456
nfaber@nangeistfaber.com

Counsel to Paul Navarro

/s/ Robert J. Axelrod
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
(646) 448-5263
rjaxelrod@axelrodllp.com

Co-Counsel to Nan Geist Faber, P.C.

cc: Counsel of Record (via ECF)